UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| BONFIGLIOLI USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2: 23-014-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MIDWEST ENGINEERED | ) | **MEMORANDUM OPINION** |
| COMPONENTS, INC., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is pending for consideration of Defendant Midwest Engineered Components, Inc.'s ("MEC") Motion for Judgment as a Matter of Law, New Trial, or Amended Judgment  [Record No. 110][1],  Plaintiff Bonfiglioli USA, Inc.'s ("Bonfiglioli") Motion for Sanctions  [Record No. 111], and MEC's Motion to Strike, in Part, Bonfiglioli's reply Memorandum in Support of its Motion for Sanctions [Record No. 118].  Each motion will be denied for the reasons outlined herein.

## I.

The events that led Bonfiglioli and MEC to trial were mostly uncontested, but their implications are vociferously disputed.[2]  At some point prior to 2019, Bonfiglioli sought a sales representative to market its industrial products in Minnesota, Wisconsin, Iowa, North

---

[1]    MEC moves the Court under Federal Rules of Civil Procedure 50(b), 59(a), and 59(e), respectively.

[2]    The Court previously provided a more complete background of the relevant facts in its April 4, 2024, Memorandum Opinion and Order.  [Record No. 68]

Dakota, and South Dakota. [Record No. 59, p. 3] Bonfiglioli found MEC. On March 6, 2019, the parties entered a sales representation agreement under which MEC would sell Bonfiglioli's products in the aforementioned states. Most of this agreement was incorporated into a Sales Representative Agreement (the "SRA") in 2020, which superseded the 2019 agreement. [Record No. 54-4, § 8.11] The 2019 agreement provided that it would be "performed, construed and enforced exclusively in accordance with, and the rights of the parties hereto shall be governed by the laws of the State of Kentucky and the federal laws of the United States of America applicable therein." [Record No. 54-3, § 8.9] However, MEC had different plans.

Before signing the agreement, MEC's then-CEO Ken Lastovic emailed MEC's former owner Charlie Quarstad to ask for advice regarding the contract's terms. [Record No. 54-7, p. 1] Referring to the § 8.9 agreement to be governed by Kentucky law in the email, Quarstad stated, "[t]his agreement is made and enforced by the laws governed by the State of Kentucky. **We know MN laws supersede this. I would not make mention**." [*Id.*] This correspondence is what Bonfiglioli would later refer to as the "smoking gun email." It refers to the Minnesota Termination of Sales Representatives Act ("MSRA"), a statute that (according to MEC) would purportedly control the parties' contract, even if Bonfiglioli had no knowledge of it.

The MSRA contains an aggressive "anti-waiver" provision that thwarts parties' attempts to "circumvent compliance" with the statute through alternative choice of law or venue provisions or waivers. Minn. Stat. § 325E.37, subd. 7 (2023). It also provides:

(a) A manufacturer, wholesaler, assembler, or importer may not terminate a sales representative agreement unless the person has good cause and:

(1) that person has given written notice setting forth the reason(s) for the termination at least 90 days in advance of termination; and

(2) the recipient of the notice fails to correct the reasons stated for termination in the notice within 60 days of receipt of the notice.

Minn. Stat. § 325E.37, subd. 2 (2023). This provision conflicted with the parties' agreement under section 5 of the SRA—which provided that either party could terminate the SRA at their discretion. Under the MSRA's anti-waiver provision, this section would be void.

"On October 6, 2022, Bonfiglioli informed MEC in writing of its intent to terminate the SRA." [Record No. 68, p. 6] MEC, however, waited until January 2, 2023, to inform Bonfiglioli by letter it had allegedly violated subdivision 2 of the MSRA. In that same letter, MEC offered to settle the dispute for $165,000. Bonfiglioli brought this civil action against MEC in the Boone Circuit Court on January 12, 2023, and the action was later removed to this Court. [Record No. 1-1] Ultimately, this Court held that Kentucky law governed the proceedings, and that the MSRA was inapplicable. A fraud by omission claim raised by Bonfiglioli was dismissed, but the action proceeded to trial on Bonfiglioli's fraudulent inducement claim against MEC. [Record No. 68]

During trial, Bonfiglioli was awarded $1 in nominal damages and $280,000 in punitive damages after a jury found MEC liable for fraudulent inducement. MEC's first motion [Record No. 110] alleges that: (1) the Court improperly limited testimony regarding Bonfiglioli's dismissed fraud by omission claim; (2) Bonfiglioli failed to provide sufficient evidence to establish fraudulent inducement; and (3) the jury's $280,000 punitive damages award is unconstitutional.

Next, based on MEC's actions before and during the proceedings, Bonfiglioli moves the Court to impose sanctions, or grant it $305,623.00 in attorneys' fees. [Record No. 111]

Finally, MEC has moved to strike [Record No. 118] portions of Bonfiglioli's reply brief. Each motion is addressed below.

## II.

Judgment as a matter of law is warranted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" regarding a particular issue. Fed. R. Civ. P. 50(a)(1). A motion seeking such relief may be granted "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsey v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012). The Court does not "reweigh the evidence, question the credibility of witnesses, or substitute [its] own judgment for that of the jury." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (quoting *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016)). In other words, a judgment as a matter of law is appropriate only when "there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001). Although the Court reviews the record as a whole, it disregards all evidence favorable to the moving party that the jury is not required to believe. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

Next, Rule 59(a) of the Federal Rules of Civil Procedure authorizes a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This includes cases in which a jury has reached a

"seriously erroneous" result, as evidenced by "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015).  And most significantly, the Court cannot set aside the jury's verdict simply because it thinks another result is more justified.  *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 534 (6th Cir. 2014).

## III.

### A.  Limits on "Fraud by Omission" Testimony

MEC first argues that the Court erred by restricting instructions and testimony related to Bonfiglioli's dismissed fraud by omission claim.  However, MEC ignores overlaps between elements of fraudulent omission and fraudulent inducement that explain why introducing the dismissed fraud by omission claim would have confused the jury, and why Bonfiglioli was properly allowed to mention MEC's nondisclosure.  MEC's misunderstanding warrants a review of both claims and their essential elements under Kentucky law.

#### Fraudulent Inducement:

To establish fraudulent inducement in Kentucky, a plaintiff must establish the following elements by clear and convincing evidence:

> (1) that the declarant made material representation to the plaintiff, (2) that the representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff reasonably or justifiably relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 45 (Ky. 2018) (quoting *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009)) (cleaned up).  "One may commit 'fraud by the inducement' by making representations as to his future intentions when in fact he knew at the time the representations were made he had no intention of carrying them out."  [Record No. 68, p. 21 (citing *Major v. Christian Cnty. Livestock Mkt.*, 300 S.W.2d 246, 249 (Ky. 1957).]

### Fraud by Omission:

By contrast, fraud by omission requires proof of the following separate elements: "(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence."  *Yung*, 563 S.W.3d at 45 (quoting *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011)). "Fraud by omission is grounded in a duty to disclose."  *Yung*, 563 S.W.3d at 45 n.27.  The existence of that duty is a matter of law for the court to determine.  *Giddings & Lewis*, 348 S.W.3d at 747.

At issue here is the distinction between the *legal duty of disclosure* required to prove fraud by omission, and the *false representation* required to establish fraudulent inducement. MEC argues that the Court eliminated its ability to defend itself at trial by excluding testimony and jury instructions related to Bonfiglioli's dismissed fraud by omission claim and MEC's corresponding lack of legal obligation to disclose the MSRA during negotiations.  However, this testimony would only confuse the jury on the operative law.

Defendant MEC argues that the Court (1) "erred by refusing to instruct the jury on its prior dismissal of Bonfiglioli's fraud by omission claim … and its finding that MEC had no

duty to inform Bonfiglioli of the MSRA" and (2) "erred by forbidding MEC from soliciting testimony or offering argument regarding the dismissal of this claim." [Record No 110, pp. 1-2] Bonfiglioli's fraud by omission claim was dismissed at the summary judgment stage because MEC had no legal duty to disclose the invalidity of the SRA's choice-of-law provision under Minnesota law (an essential element of fraud by omission in Kentucky). [Record No. 68, pp. 24-25] MEC now contends it should have been allowed to introduce evidence of a *dismissed* claim, and the Court should have limited Bonfiglioli's ability to prove an *active* claim.

Prior to trial, MEC submitted proposed jury instructions that would have introduced the dismissed fraud by omission claim. [Record No. 86] The Court rejected those instructions, and informed MEC that argument and testimony concerning the claim were unnecessary unless Bonfiglioli first raised the issue. [Record No. 104, p. 46] MEC claims that Bonfiglioli raised the issue (specifically, whether MEC had a legal obligation to inform Bonfiglioli of the MSRA) and it was not allowed to adequately respond. This contention fails for three reasons. First, the Court properly limited testimony on the dismissed fraud by omission claim to avoid confusing the jury. Second, Bonfiglioli did not create, in the eyes on the jury, "the unmistakable impression that MEC had an obligation" to disclose its knowledge that the MSRA was controlling despite the parties' agreement to use Kentucky law. [*Contra* Record No. 110, p. 7] Third, to the extent Bonfiglioli invoked the dismissed fraud by omission claim at all, MEC was afforded adequate opportunity to respond.

Under Rule 403 of the Federal Rules of Evidence, the Court may exclude relevant evidence if its probative value is substantially outweighed by, among other things, the risk it

will confuse the issues or mislead the jury.  Fed. R. Evid. 403.  Here, allowing MEC to excessively introduce evidence of Bonfiglioli's dismissed fraud by omission claim would have both misled the jury and confused the issues.

As an initial matter, both the dismissed claim and the active claim concerned fraud. Allowing the jury to hear repeated testimony about the dismissed fraud by omission claim would have been misleading *through* this confusion of the issues.  This would pose an especially dangerous risk because allowing MEC to continually assert a lack of "legal duty" to disclose the existence of the MTSRA could (and likely would) confuse the jury on the applicable law.  *See Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 592 (6th Cir. 2003) (citing *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 118 (2d Cir. 2000)) ("The jury ... does not need to be lectured on the concepts that guide a judge in determining whether a case should go to the jury") (cleaned up).  And MEC had another option—it could have instead argued that Bonfiglioli's reliance on it was unreasonable—negating Bonfiglioli's fraudulent inducement claim without risking confusing the jury.  Notably, MEC presented such testimony, when it argued that Bonfiglioli should have further investigated Minnesota's regulatory landscape before signing the SRA.  [*See* Record No. 107, p. 99.]

Next, MEC's contention that the jury's notes on the instructions indicate it believed MEC had a legal duty to disclose is misguided.  On the portion of the jury instructions that lists the elements of fraudulent inducement, there are notes on the paper that check a box next to each element except for "[t]he representation was false."  [Record No. 94, p. 13]  MEC claims these notes mean "the jury's finding on this element was based largely on MEC's decision to stand on its legal right to remain silent about the MSRA[.]" [Record No. 110, p.10]

- 8 -

However, it is equally likely that the notes indicate the jury concluded the other elements of fraudulent inducement were satisfied before they decided whether MEC's actions constituted a factual misrepresentation. Arguing "[n]o other conclusion can be drawn" from the jury's ambiguous handwritten notes appears slightly conspiratorial. [*Contra* Record No. 110, p. 10] The Court already clarified that "[a]t issue is not whether MEC misrepresented the law, but whether it misrepresented its intent to be bound by the terms of the SRA. That is a misrepresentation of fact rather than a misrepresentation of law." [Record No. 68, p. 23] Nothing in the notes MEC cites establish a reliance on the legal duty element of fraud by omission; therefore, MEC's present claim is unfounded.

MEC further alleges that Bonfiglioli improperly *de facto* raised the dismissed fraud by omission claim by implying MEC had a duty to disclose the MSRA's purported precedence over Kentucky law. But this argument is unsubstantiated, because the alleged transgressions MEC raises do not indicate the jury was surreptitiously noticed of a legal duty to disclose. MEC takes issue with the following statements made by Bonfiglioli's attorney:

> MR. KNAPPICK: And the most troubling thing about this case is that the defendant's email concludes that the defendant deliberately and intentionally not tell Bonfiglioli. Instead, the defendant kept it to itself and signed the contract, leading Bonfiglioli to think the parties had a deal.
>
> ** ** **
>
> MR. KNAPPICK: Finally, Bonfiglioli will call Orval Charlie Quarstad, the man who wrote the smoking gun email. And Mr. Quarstad will testify that MEC, the defendant, knew the contract was controlled by Kentucky law, knew that the defendant did not intend to comply with Kentucky law but always intended to apply Minnesota law. And, again, most troublingly, instructed the defendant not to tell Bonfiglioli. And during the testimony, you will realize all these witnesses are telling you the same thing. Mr. Guy, Mr. Schulte, Mr. Frater, Mr. Quarstad are all telling you that Bonfiglioli -- excuse me, that the defendant chose not to tell Bonfiglioli about its true intentions under the contract.

- 9 -

** ** **

[Record No. 107, p. 13; pp. 14-15]  Finally, MEC also argues that Bonfiglioli "leaned into the argument that MEC's failure to tell Bonfiglioli about the MSRA was evidence of fraudulent intent; this included the use of phrases like MEC used the MSRA to 'trap' Bonfiglioli, or MEC kept the MSRA secret to later 'pull the rug' out from underneath Bonfiglioli."  [Record No. 110, p. 9 (citing Record No. 107 pp. 21-22; p. 24; p. 31)]

But MEC is incorrect.  Bonfiglioli's attorney never implied MEC had a *legal duty* to disclose, rather, counsel for Bonfiglioli implied that MEC's failure to disclose was a *factual misrepresentation* of its intent to flout the terms of the SRA.  Statements that MEC used the MSRA to "trap" Bonfiglioli, or MEC kept the MSRA secret to later pull the rug out from underneath Bonfiglioli do not hint at a lack of legal obligation to disclose the MSRA.  Instead, they help establish that MEC *factually misrepresented* its intent to be bound by Kentucky law under the SRA.  And Mr. Knappick made clear that MEC "did not intend to comply with Kentucky law[,]" not that MEC's nondisclosure violated a binding legal duty.  Bonfiglioli's statements about MEC's intent to deceive it were warranted to establish the misrepresentation element of fraudulent inducement.  And MEC's claims that the Court prejudicially limited its ability to introduce the dismissed claim in response to Bonfiglioli are similarly contradicted by the record.

MEC alleges that the Court "deprived MEC of its central argument in defense of this claim[.]" [Record No. 110, p. 10] However, MEC was still allowed to introduce it, as evidenced by the trial transcript:

- 10 -

Secondly, in his opening statement, Mr. Knappick suggested that my client didn't tell them about the Minnesota Sales Rep Act, the MSRA, and that we pulled the rug out from underneath Bonfiglioli while we were selling $5 million of their product.

As part of this lawsuit, they brought a claim for fraud by omission. Fraud by omission, means you didn't tell us about the MSRA. And because we didn't know about it, we walked into a claim that was brought years later under the Act. That's fraud by omission.

The Court dismissed that claim. The Court has issued a ruling that my client had no legal obligation to tell Bonfiglioli anything about the MSRA.

[Record No. 107, pp. 20-21] In addition to arguing it in his opening statement, Mr. Taylor was also permitted to reintroduce the claim during his closing argument.

The closing argument you just heard must have said – Mr. Knappick must have said at least 20 times they kept it a secret. They're tricky. They didn't want Bonfiglioli to know about the existence of the Minnesota law that voids, specifically, the provisions that he's recited to you in this sales rep agreement. They kept that to themselves.

But my client had no obligation, zero, to share this information, to share this nugget of information. And because they didn't have an obligation to share that nugget of information, it's not fraud. It's not clear. It's not convincing.

[Record No. 108, pp. 33-34]

Even at risk of confusing the jury, MEC was allowed to argue its lack of legal duty to disclose the MSRA's existence thoroughly in its opening and closing statements. Despite this, the jury found MEC liable. In sum, MEC has failed to demonstrate that the Court's modest limitations on its attempts to introduce a claim dismissed on summary judgment were improperly excluded. It has failed to demonstrate that Bonfiglioli tainted the jury's decision by a supposed innocuous introduction of the issue. And MEC cannot show that it was prevented from responding to this perceived issue. Consequently, it fails to show that the jury reached a seriously erroneous result.

- 11 -

**B. Proof of Fraudulent Inducement during Trial**

MEC next contends that Bonfiglioli's fraudulent inducement claim fails because it produced no evidence of the 2019 SRA contract negotiations and its "admission that it did nothing to familiarize itself with the regulatory landscape in Minnesota, before hiring a Minnesota-based sales agency, is a further failure of proof as to the element of reasonable reliance[.]" [Record No. 110, p. 2] These claims fail because fraudulent inducement can be established through circumstantial evidence. Further, the jury weighed sufficient evidence to determine Bonfiglioli reasonably relied on MEC's misrepresentation.

"In Kentucky, a claimant may establish detrimental reliance in a fraud action when he acts or fails to act due to fraudulent misrepresentations." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999). Further, "such proof may be developed by the character of the testimony, the coherency of the entire case as well as the documents, circumstances and facts presented" and "[f]raud may be established by evidence which is wholly circumstantial." *Id.* at 468. MEC's first assertion therefore is directly contradicted by existing law. Bonfiglioli produced evidence of the smoking gun email, which evinced MEC's nefarious intentions, and it bolstered that understanding with circumstantial evidence—specifically, the suspicious nature and timing of MEC's actions after the SRA was terminated. Because this evidence was sufficient to establish fraud under Kentucky law, MEC's first argument fails.

MEC further claims that Bonfiglioli's admission it did not research Minnesota's regulatory landscape defeats the "reasonable reliance" element of fraudulent inducement as a matter of law. The Court explained that disposition of this element depended on "whether Bonfiglioli, under all the facts that are presented, acted reasonably and justifiably when it relied

upon the misrepresentation that was made[.]" [Record No. 107, pp. 174-175] Kentucky courts have consistently recognized that because "a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such intention is fraudulent[.]" *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 614 (Ky. Ct. App. 2011) (citing *Hanson v. Am. Nat. Bank & Tr. Co.*, 865 S.W.2d 302, 307 (Ky. 1993)). In the case at hand, MEC negotiated and signed the SRA (which dictated Kentucky law would apply) intending not to comply. In Kentucky, those actions suffice to show reasonable reliance. *See generally PCR Contractors*, 354 S.W.3d 610. The jury found that by agreeing to one thing and intending to do another, MEC made a fraudulent inducement and Bonfiglioli reasonably relied upon it. Unlike the examples of rulings to the contrary, Bonfiglioli neither relied on a speculative future statement, nor an alternative opportunity to conduct due diligence. Accordingly, MEC's claim that the evidence was insufficient to support the jury's verdict is simply incorrect.

MEC cites *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544 (Ky. 2009), for the proposition that "experienced [market] participants have an affirmative duty to exercise reasonable diligence to protect their own business interests." [Record No 110, p. 13] While this is true, the *Flegles* court held that there was no actionable claim when a party relies on "a mere statement of opinion or prediction[.]" 289 S.W.3d at 549. Here, MEC's promise was not speculative. MEC did not "predict" to follow Kentucky law, or generally "aspire" to follow Kentucky law. Instead, it signed a contract agreeing to be *explicitly governed* by Kentucky law while subterraneously intending for it to never be applied.

- 13 -

Similarly, *Stansbury v. Hopkins Hardwoods, Inc.*, 769 F. App'x 202, (6th Cir. 2019), provides no assistance to the defendant. *Stansbury* presented an extreme case in which the plaintiffs possessed two estimates of the value of timber rights and decided to blindly trust the suspiciously favorable estimate proffered by the defendants. Here, unlike *Stansbury*, Bonfiglioli possessed no obvious alternative representation that indicated Kentucky law would not apply. Their due diligence was effectuated through negotiations for Kentucky law to apply to the SRA precisely so they would not be required to consider another state's legal landscape. Whether Bonfiglioli should have conducted additional research into Minnesota law after their negotiation of the SRA was thus a question for the jury, and one that it definitively answered.

Because MEC cannot demonstrate that no reasonable jury could have ruled in favor of Bonfiglioli, or that its verdict contravened the weight of the evidence, the Court will deny MEC's motion for judgment as a matter of law and for a new trial.

**IV.**

Next, MEC moves for remittitur, or an amended judgment of the jury's $280,000 punitive damage award under Rule 59(e) of the Federal Rules of Civil Procedure. However, the jury's punitive damage award was constitutional because MEC actions were uniquely reprehensible, and similar awards put the defendant on notice of the potential monetary consequences of its conduct.

Remittitur is appropriate when, "after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court."

- 14 -

*Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 5 (6th Cir. 2021) (quoting *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000)).

"Punitive damages awards serve the same purpose as criminal penalties. However, because civil defendants are not accorded the protections afforded criminal defendants, punitive damages pose an acute danger of arbitrary deprivation of property[.]" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003). This risk "is heightened when the decisionmaker is presented with evidence having little bearing on the amount that should be awarded." *Id.* The United States Supreme Court first employed a three-pronged test used to determine the constitutionality of punitive damages in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). The test considers: (1) the degree of reprehensibility of the defendant's conduct; (2) the award's ratio to the actual harm inflicted on the plaintiff; and (3) the difference between the remedy and the civil penalties authorized in comparable cases. *Id.* at 575.

1. Reprehensibility

To determine the reprehensibility of MEC's actions, the Court considers whether "the harm was physical rather than purely economic; the tortious conduct evinced an 'indifference to or a reckless disregard of the health or safety of others'; 'the conduct involved repeated actions or was an isolated incident'; and the harm resulted from 'intentional malice, trickery, or deceit, or mere accident.'" *Kidis v. Reid*, 976 F.3d 708, 716 (6th Cir. 2020) (quoting *State Farm*, 538 U.S. at 419). In this case, the harm *would* be economic rather than physical, but because the jury awarded nominal damages, it found MEC did not technically harm Bonfiglioli. *See Kidis*, 976 F.3d at 718. And because MEC's actions were economic in nature, the "reckless disregard of the health or safety of others" prong does not apply. The final two

- 15 -

guideposts, however, weigh heavily against MEC.  MEC's actions before signing the SRA, and after Bonfiglioli attempted to terminate the contract demonstrate willfully dishonest, unscrupulous behavior that ultimately led to liability for fraud.

When MEC signed the SRA, it never intended to comply with its choice of law provisions.  As the "smoking gun" email illustrates, MEC believed that the MSRA would apply, and intentionally declined to disclose this to Bonfiglioli.[3]  And when Bonfiglioli attempted to terminate the SRA, MEC intentionally waited until it was virtually too late for Bonfiglioli to remedy the situation, evidencing premeditated plans to extort Bonfiglioli.  Instead of affording Bonfiglioli the opportunity to remedy the breach (assuming the MSRA applied), MEC attempted to shake Bonfiglioli down for $165,000 on the basis of a law Bonfiglioli had never even heard of.[4]

Other facts indicate this was likely a repeated scheme.  Notably, counsel for MEC has a YouTube channel in which he details the contours of contract termination under the MSRA on video.[5]  In his "Agency Termination" video, Taylor explains that sales representatives are protected under the statute unless they are given six months advance notice (which contravenes the parties' agreement in the SRA).  This militates towards a finding that MEC and its counsel

---

[3]    The jury found this was a misrepresentation, whether MEC had a legal duty of disclosure.

[4]    This Court is not the first to recognize the potential coercive force the MSRA's anti-waiver provision enables.  *See Takeya USA Corp. v. Powerplay Marketing Group, LLC,* 2022 WL 17357781, *10 (C.D. Cal. Sept. 1, 2022) ("Minnesota's anti-waiver provision, if not known to the out-of-state party, creates an opportunity for mischief[.]")

[5]    D.  Clay  Taylor,  <u>Agency  Termination</u>,  YouTube  (Jun  17,  2015) https://www.youtube.com/watch?v=lDzBKaYSXJA/.

are repeat offenders in an industry where parties conducting business in Minnesota who negotiate for different laws to apply are bound to be blindsided.  In this case, MEC and its counsel took advantage of the plaintiff.  And the Court has no way of knowing how many cases settled before MEC was finally challenged for this distasteful strategy.

Finally, and most importantly, MEC's actions indicate intentional malice and trickery, not mere negligence.  The jury found its conduct was fraudulent, which is beyond mere accident.  In essence, MEC attempted to extract a $165,000 ransom payment from Bonfiglioli, callously wielding the MSRA like a tyrannical chainsaw.  The jury repudiated those actions by awarding punitive damages.

## 2.  Ratio

In *Romanski v. Detroit Ent., LLC*, 428 F.3d 629, 645 (6th Cir. 2005), the United States Court of Appeals for the Sixth Circuit distinguished *Gore's* ratio component in cases involving nominal, rather than compensatory damages.  The *Romanski* court held "the Supreme Court's cases on the ratio component of the excessiveness inquiry—which involved substantial compensatory damages awards for economic and measurable noneconomic harm—are … of limited relevance."  *Id.*  And in *Kidis v. Reid*, 976 F.3d 708 (6th Cir. 2020), the Sixth Circuit addressed the constitutionality of punitive damages in a situation with a $1 nominal damage award.  The *Kidis* court explained that the ratio factor is still largely irrelevant in such cases, however, the lack of compensatory damages does impact the analysis under *Gore's* third guidepost.  The undersigned will address that next.

## 3.  Comparable Penalties

Similar to the facts in *Kidis*, this Court also faces a punitive damage award's constitutionality relative to a $1 nominal damage award. In *Kidis*, the Sixth Circuit reduced a $200,000 punitive damages award to $50,000, on the basis that the plaintiff was not physically harmed, and relative to other § 1983 cases where compensatory damages *were* awarded, the award was on the high side. Looking to awards in similar cases of fraud, the Court is satisfied that MEC was sufficiently on notice regarding the potential monetary sanctions it could face for its conduct. However, the nebulous nature of fraud cases makes it difficult to ascertain exactly how reasonable an award is without the tether a compensatory damage ratio provides. Consequently, the Court evaluates other punitive damage awards in fraud cases, before addressing ancillary considerations. (The asterix (*) after each number indicates a 2024 inflation-adjusted dollar value).

- In *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650 (E.D. Ky. 2009), this Court upheld a $100,000/$146,216* punitive damages award (among multiple individual defendants) involving fraud and breach of fiduciary duty.

- In *Anderson v. Wade*, 33 F. App'x 750 (6th Cir. 2002), the Sixth Circuit affirmed $500,000/871,842* in punitive damages where the defendants fraudulently misrepresented an options contract to the plaintiff.

- In *Arvest Bank v. Byrd*, 548 F. App'x 324 (6th Cir. 2013), the Sixth Circuit affirmed a punitive damages award of $ 2,353,000/3,168,439* after a fraudulent conveyance.

- In *PBI Bank, Inc. v. Signature Point Condos. LLC*, 535 S.W.3d 700 (Ky. Ct. App. 2016), the Kentucky Court of Appeals affirmed a $5,500,000/7,188,496* punitive damages award in a case involving real estate financing fraud (among other claims).

- In *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22 (Ky. 2018), the Kentucky Supreme Court affirmed a punitive damage award of $80,000,000/99,937,954* where former clients sued an accounting firm for fraudulently selling and maintaining a financial product.

Compared to the above awards, the jury's $280,000 verdict in this case is on the lower end of the spectrum. But fraud comes in many shapes and sizes, and large awards in some cases may not warrant comparable awards in others. Acknowledging a relative lack of reasonable data points, the undersigned looks to other factors distinguishing this case from the facts in *Kidis*. First, the undersigned looks to MEC's $165,000 "settlement offer." While not a civil penalty *per se*, it does help put the jury's $280,000 award into perspective. MEC offered Bonfiglioli $165,000 to settle an impending legal dispute. If Bonfiglioli had capitulated, MEC would have received the $165,000 windfall for doing nothing other than threatening baseless litigation. After a drawn-out battle that concluded in a fraudulent inducement verdict at trial, Bonfiglioli was awarded approximately 1.7 times the "settlement" payment it would have otherwise owed MEC. In light of this prospective and abstract "penalty," the jury's award did not greatly exceed what MEC saw as an appropriate exaction for itself.

Next, *Kidis* presented a § 1983 case against a law enforcement officer found liable for excessive force, a physical violation of the plaintiff's constitutional rights whereas here the Court addresses business fraud. Other than the lack of compensatory damages, there are few similarities between *Kidis* and the present case, especially regarding the defendants themselves. Here, MEC is a relatively large business that attempted to fraudulently induce another business. Considering MEC's financial position, as opposed to that of an individual defendant, the jury's award is appropriate to adequately provide for deterrence. *See Romanski*, F.3d at 647 ("The defendant's financial position is equally relevant to the State's interest in deterrence, which is also a valid purpose of punitive damages.")

- 19 -

In conclusion, because MEC's actions were sufficiently reprehensible, and considering similar awards, the need for deterrence, and the circumstances of the case, the Court will uphold the jury's $280,000 punitive damages award.

## V.

Before addressing Bonfiglioli's Motion for Sanctions, the Court will review MEC's Motion to Strike portions of Bonfiglioli's reply brief, in which it alleges Bonfiglioli purportedly introduced new arguments that were not included in its initial memorandum. The parties agree that new arguments cannot be raised in a reply brief. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). However, they dispute whether Bonfiglioli's assertion concerning MEC's voluntarily-dismissed MSRA counterclaim constitutes a "new argument." The undersigned finds that Bonfiglioli did not raise a new argument because it asserted an initial claim concerning needlessly increasing litigation costs.

Bonfiglioli asks for sanctions against MEC based, *inter alia*, on the Court's inherent authority, 28 U.S.C. § 1927, and the Kentucky Supreme Court Rules. In its initial memorandum, Bonfiglioli argued sanctions were appropriate because MEC and its counsel were aware the defendant's actions prior to trial and during the litigation were meritless and "MEC's scheme was to utilize the court system as leverage to perpetrate a fraud[.]" [Record No. 111-1, p. 5] Bonfiglioli contends that MEC planned to "use the court system and its associated costs as the tool to force Bonfiglioli to capitulate" and specifically argued MEC drove up costs "[b]y intentionally delaying the demand until Bonfiglioli's opportunities to cure or mitigate had expired[.]" [*Id.*, p. 6]

Bonfiglioli *only later* averred that "MEC voluntarily dismissed its Counterclaim, without prejudice" and "unnecessarily increased Bonfiglioli's attorney's fees" to that specificity in its reply brief. [Record No 116, p. 6] However, Bonfiglioli's argument that MEC needlessly dilated costs sufficiently encapsulates its specific claims concerning MEC's methods of doing so. MEC also argues that it had a good-faith basis to pursue claims under the MSRA in this proceeding in its reply. Bonfiglioli's reply builds on potentially sanctionable "cost-increasing behavior" arguments it raised in its motion for sanctions and responds to MEC's assertion its MSRA claims were pursued in good faith. Consequently, the Court will consider arguments in Bonfiglioli's reply brief.

## VI.

"Bonfiglioli offers the Court a smorgasbord of legal standards or avenues to award it the sanctions it seeks[.]" [Record No. 115, p. 1] Specifically, it moves the Court to sanction MEC either through the imposition of equitable attorneys' fees, the Court's inherent power, Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. §1927, or the Kentucky Supreme Court Rules.

### A. Attorney's Fees

"In the United States, parties are ordinarily required to bear their own attorney's fees— the prevailing party is not entitled to collect from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240 (1975). The American Rule is rooted in the bedrock of our legal tradition, and it normally enables parties to pursue their good faith claims without fear of penalty if they lose. *Peter v. Nantkwest, Inc.*, 589 U.S. 23, 28 (2019). But state courts of equity, statutory fees, or sanctions can occasionally provide an exception. *See id.*

Bonfiglioli first requests equitable attorneys' fees under Kentucky common law, but because this principle is no longer recognized in the commonwealth, the claim fails. The parties point to *Mo-Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900 (Ky. App. 2015), *Bell v. Commonwealth,* 423 S.W.3d 742 (Ky. 2014), and *Seeger v. Lanham*, 542 S.W.3d 286 (Ky. 2018) in support of their respective claims.

In *Bell*, the Kentucky Supreme Court explained that "attorney's fees in Kentucky are not awarded as costs to the prevailing party unless there is a statute permitting it or as a term of a contractual agreement between the parties." *Id.* at 748. In *Mo-Jack*, the Kentucky Court of Appeals addressed a situation in which a jury awarded attorneys' fees as compensatory damages. And while the Mo-Jack court did mention the concept of "equitable attorneys' fees," it only referenced *Batson v. Clark*, 980 S.W.2d 566, 577 (Ky. Ct. App. 1998), a Kentucky Court of Appeals case predating *Bell* by sixteen years. Further, the *Mo-Jack* Court held that attorneys' fees could not be considered compensatory damages, *not* that "equitable attorneys' fees" were alive and well. 476 S.W.3d at 907. Finally, the Kentucky Court of Appeals confirmed this abrogation in *Seeger* ("without a sound basis in contract or statute, a trial court may not award attorneys' fees.") 542 S.W.3d at 295. The Court concludes that it lacks authority to award Bonfiglioli attorney's fees as an equitable matter.

**B. The Court's Inherent Authority:**

Bonfiglioli next asks the Court to sanction MEC through its inherent authority. On this basis, the Court "may assess attorney's fees under its inherent powers 'when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]'" *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46 (1991)).

- 22 -

To justify sanctions utilizing the Court's inherent authority, Bonfiglioli must establish that "the claims advanced [by MEC] were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.,* 125 F.3d 308, 313 (6th Cir.1997).

Here, the undersigned must make a crucial distinction between MEC's conduct *before* Bonfiglioli filed the present suit, and MEC's conduct *during* the present litigation. Before suit was instituted, MEC's conduct was abhorrent (and fraudulent, according to the jury). MEC attempted to leverage the MSRA to improperly induce Bonfiglioli to sign the SRA, which it never intended to follow. Then, when Bonfiglioli attempted to terminate the contract, "one day after it was too late for Bonfiglioli to comply with the MTSRA" MEC declared a breach and demanded $165,000. [Record No. 111-1, p. 6] When Bonfiglioli refused to pay, MEC filed suit in Hennepin County District Court in Minnesota. Shortly thereafter, Bonfiglioli initiated the present action, and the Minnesota case was stayed. These actions were taken in bad faith, but during the litigation (except for its closing argument, addressed later in this section) MEC's actions were not as egregious.

In Bonfiglioli's motion for sanctions, it alleges "[b]y design, this fraud is not only practiced upon Bonfiglioli but also on the Court. This is because, in order for MEC's threat to have any meaning, it required the Court to go along for the ride." [*Id.*] However, Bonfiglioli's arguments on this point are belied by the *Big Yank* factors and applicable case law. Notably, the claims advanced by MEC were not meritless. Its actions were found to be fraudulent at trial, but it had a good faith basis to argue that Bonfiglioli's reliance was not reasonable (a necessary element of fraudulent inducement). This is especially salient

- 23 -

considering that Bonfiglioli's president Greg Schulte admitted that, to his knowledge, no one at Bonfiglioli looked at a Minnesota law before signing the SRA. [Record No. 107, p. 62]

Ultimately, the jury concluded that Bonfiglioli's reliance on MEC was reasonable, but MEC had a sufficient factual basis to make a contrary argument. In this sense, MEC did not advance "meritless" claims, despite being found liable for fraud. And Bonfiglioli cites no cases that would call this understanding of the first *Big Yank* factor into question. It instead references a 1791 case from the Supreme Court of New Jersey in which a plaintiff was swindled out of a debt equivalent to "the price of two horses[.]" *Snyder v. Findley*, 1 N.J.L. 48 (N.J. Sup. Ct. 1791). Unsaddled from that decision, the Court looks to the Sixth Circuit's understanding of inherent authority sanctions. *See Metz* (affirming the district court's decision to impose sanctions after a party re-raised disallowed claims three years later against a dismissed defendant, moved to dismiss those claims without prejudice only after the defendant responded, and skipped a status conference); *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.,* 307 F.3d 501 (6th Cir. 2002) (party intentionally withheld material evidence.) Case law on "inherent power" sanctions applies only "where a party litigates in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46.

While MEC's actions before filing suit were taken in bad faith, its actions and the actions of its attorney during the present action, while far from commendable, are insufficient to justify "inherent authority" sanctions. In its reply [Record No. 116], Bonfiglioli addresses MEC's dismissed counterclaims in the context of inherent authority sanctions. This inquiry is closer, but the Court is still not inclined to deem this behavior sanctionable.

On April 28, 2023, the Court denied MEC's motion to dismiss, ruling that Kentucky law would apply to the proceedings.  [Record No. 29]  On May 12, 2023, MEC filed an answer to Bonfiglioli's amended complaint, and asserted a counterclaim for "wrongful termination" under the MSRA.  On June 2, 2023, Bonfiglioli filed its first motion to dismiss.  [Record No. 35]  Shortly thereafter, on June 23, 2023, MEC amended its counterclaim, and added one line:

> Upon information and belief, the choice of Kentucky law in the parties' independent sales representative agreement was inserted by Bonfiglioli to circumvent to avoid the application of the contrary laws of any other state, including Minnesota law, as embodied in the MSRA, and is therefore void, by operation of Minn. Stat §325E.37, Subd. 7. Accordingly, the MSRA is applicable to the parties' relationship and the present dispute.

[Record No. 36, ¶ 13] Roughly two weeks later, on July 6, 2023, Bonfiglioli filed a second motion to dismiss, which was almost identical to its first. [Record No. 37]  On July 26, 2023, MEC voluntarily dismissed its counterclaim without prejudice.  [Record No. 40]

Unlike MEC's defense of the fraudulent inducement claim, its actions in this respect are at least potentially sanctionable.  Even so, the Court views this possibility warily because MEC's actions were not necessarily worthy of the harsh punishment sanctions provide.  And "[b]ecause the court's inherent power to impose sanctions is discretionary, the [C]ourt is not required to sanction a party or attorney even if it has determined that some wrongdoing has occurred[.]" *Murray v. City of Columbus, Ohio*, 534 F. App'x 479, 485 (6th Cir. 2013).  When MEC filed its counterclaim under the MSRA, the Court had already ruled that Kentucky law would apply to this action.  This was arguably frivolous, however, given the MSRA's ironclad anti-waiver provision, perhaps counsel believed there was a chance Kentucky law could still contemplate the Minnesota statute.  Either way, after amending it, MEC withdrew the claim, and did not reassert it later.

On one hand, this saved the Court the effort of re-addressing the MSRA's inapplicability.  But on the other hand, it forced Bonfiglioli to file a motion to dismiss that was arguably unnecessary.  Still, compared to the sanctioned party's actions in *Metz*, MEC did not raise claims against a defendant no longer party to the suit, and it also did not raise the MSRA claim years later.  Nor did it withhold any evidence.  *See* 534 F. App'x 479.  Also worth noting is that Bonfiglioli's second motion to dismiss was nearly identical to its first, because MEC raised no new substantive claims in its amended filing, so Bonfiglioli did not technically draft a new motion the second time.  [Record No. 36]  And parties are allowed to withdraw claims pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure, as MEC did.  Finally, given the context of the entire action, MEC did not necessarily pursue these claims with an improper purpose.  *See Big Yank*, 125 F.3d at 313 (Sanctionable conduct required finding that the action was pursued with an improper purpose).  In light of the weighty nature of imposing sanctions, and the relatively benign nature of MEC's behavior, the undersigned concludes MEC's conduct was questionable, but not quite sanction-worthy.

### C.  28 U.S.C. § 1927:

The undersigned is not inclined to sanction MEC under 28 U.S.C. § 1927.  This statute provides, in relevant part, that "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  Because MEC did not multiply the present proceedings unreasonably and vexatiously *to a sanctionable degree*, Bonfiglioli's request for sanction under § 1927 will be denied.

"Courts may award sanctions under this section 'when an attorney knows or reasonably should know that a claim pursued is frivolous' and yet continues to litigate it. *King v. Whitmer*, 71 F.4th 511, 530 (6th Cir. 2023) (citing *Waeschle v. Dragovic*, 687 F.3d 292, 296 (6th Cir. 2012)). Again, MEC's conduct during the action does not rise to a sanctionable level. While MEC did assert the MSRA claim, and then amend it on questionable grounds, it ultimately withdrew and claim and decided not to pursue it. As a result, the undersigned finds this does not rise to the level of "fraud on the court" required to impose sanctions. *See Murray*, 534 F. App'x at 485. And for the same reasons the Court declines to exercise its inherent authority to sanction MEC, the Court finds MEC's dismissed counterclaim did not multiply the proceedings unreasonably and vexatiously *to a sanctionable degree*.

### D. Federal Rule of Civil Procedure 11:

Bonfiglioli next cites Rule 11 of the Federal Rules of Civil Procedure in support of its request for sanctions against MEC. Rule 11(b)(1) specifies that parties must represent that their filings are "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation[.]" Fed. R. Civ. P. 11(b)(1). But sanctions under this rule require service of the motion on the opposing party before it is filed with the Court. Fed. R. Civ. P. 11(c)(2). Here, Bonfiglioli does not dispute that it failed to comply with the "safe harbor" provision in Rule 11(c)(2). Consequently, the Court will not sanction MEC on this basis.

### E. Kentucky Supreme Court Rules

Finally, Bonfiglioli asks the Court to sanction MEC and its counsel for their conduct during MEC's closing argument. While the Court concludes that MEC's counsel conducted

closing argument contrary to the Kentucky Supreme Court Rules, it declines to impose monetary punishment because the violative arguments were not prejudicial based on the jury's award. In his closing statement, Taylor (counsel for MEC) argued facts outside the record even after being admonished by the Court. He also argued that the jury could draw an adverse inference from the absence of Bonfiglioli's retired CEO, Bernie Hurda. [Record No. 108 pp. 35, 37, 39, 41] While the Court is reticent to impose sanctions for this conduct in addition to a significant punitive damages award, it notes that Taylor, as counsel for MEC, should tread cautiously in the future.

For the sake of edification, it will address why MEC's arguments regarding Bernie Hurda were improper. Kentucky Supreme Court Rule 3.130(3.1) provides that "[a] lawyer shall not knowingly bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous[.]" SCR 3.130(3.1). Instead of admitting to overstepping during his closing argument, Mr. Taylor now attempts to argue that his comments about Bernie Hurda's absence were in line with the "missing witness doctrine." *See Com. Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 111 (1941).

The missing witness doctrine only allows a jury to infer a witness's testimony would have been unfavorable if a party declined to call them, when (1) the witness was available to that party to testify on a material issue, (2) the witness was within the party's control, and (3) without satisfactory explanation, the party failed to call the witness. *Coal Processing Equip., Inc. v. Campbell*, 578 F. Supp. 445, 465 (S.D. Ohio 1981), *aff'd*, 716 F.2d 902 (6th Cir. 1983).

Here, Taylor fails to show that Hurda was specifically available to Bonfiglioli, and that he was within their control. Even excusing Taylor's assumption that Bonfiglioli could have

called Hurda and willingly refused to do so, he offers no explanation regarding why he did not inform the Court about his plans to introduce this contention earlier, in contravention of *U.S. v. Beeler*, 587 F.2d 340, 343 (6th Cir. 1978) ("The rule in this Circuit is that counsel must seek and obtain an advance ruling from the Court on the permissibility of arguing for an adverse inference to be drawn from the absence of witnesses.")  MEC contends that it would not have required the Court's permission to argue this in closing, but that is only true if it satisfied the requisite elements of the missing witness rule, *which it did not*.

Again, considering the jury's punitive damage award, the Court concludes that Taylor's transgressions were not ultimately prejudicial.  So rather than impose monetary sanctions, the Court admonishes Mr. Taylor, again, to conduct himself appropriately and in accordance with a jurisdiction's rules, especially when practicing *pro hac vice*.  While counsel's actions did not taint the jury's verdict, they are nonetheless a poor indicator of proper practice, regardless of the jurisdiction.

**VII.**

Based on the foregoing, it is hereby **ORDERED** as follows:

1.    Defendant MEC's Motion for Judgment as a Matter of Law, New Trial, or Amended Judgment [Record No. 110] is **DENIED**.

2.    Plaintiff Bonfiglioli's Motion for Sanctions [Record No. 111] is **DENIED**.

3.    Defendant MEC's Motion to Strike [Record No. 118] is **DENIED**.

- 29 -

Dated: February 18, 2025.



Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky